FILED
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

# UNITED STATES DISTRICT COURT

for the
Middle District of Tennessee

DEC 04 2018

BY _____
DEPUTY CLERK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A Black Apple iPhone X smartphone, serial number unknown, a Black LG cellular telephone, serial number 804VTCL135259, and a Black ZTE smartphone, serial number 32FB7686199D currently stored at the Drug Enforcement Administration, Nashville District Office, 801 Broadway, Nashville, Tennessee.

Case No. **18 MJ-1249**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A - incorporated by reference.

located in the _____Middle_____ District of _____Tennessee_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B - incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 922(g) | Felon in Possession of a Firearm |
| 18 U.S.C. 1956, 1957 | Money Laundering |
| 21 U.S.C. 841, 846 | Conspiracy to possess with intent to distribute controlled substances. |

The application is based on these facts:

See attached statement of DEA TFO Jesse Pilote.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA TFO Jesse Pilote
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____12/04/2018_____

_____
*Judge's signature*

City and state: Nashville, TN

~~Hon. Jeffery S. Frensley, Magistrate Judge~~
*Printed name and title*

Hon. Barbara D. Holmes, Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

IN THE MATTER OF THE SEARCH OF A
BLACK, iPHONE X SMARTPHONE,
SERIAL NUMBER UNKNOWN, A BLACK
LG CELLULAR TELEPHONE, SERIAL
NUMBER 804VTCL135259, A BLACK ZTE
SMARTPHONE, SERIAL NUMBER
32FB7686199D, CURRENTLY LOCATED
AT THE DRUG ENFORCEMENT
ADMINISTRATION, NASHVILLE
DISTRICT OFFICE, 801 BROADWAY,
NASHVILLE, TENNESSEE.

Case No. **18 MJ-1249**

**Filed Under Seal**

## STATEMENT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jesse Pilote, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") and have been since July 2009. I am currently assigned to DEA Task Force Group 2 in Nashville, Tennessee. Prior to my assignment at DEA Task Force 2, I was a Criminal Investigator with the Metro Nashville Airport Police Department. I have been employed by the Metro Nashville Airport Police Department for approximately ten years and have experience in a range of law enforcement assignments. As a DEA TFO, I have been involved in numerous narcotics trafficking investigations. Thus, I am familiar with the methods used by narcotic traffickers to purchase, transport, store, and distribute illegal narcotics, as well as the methods used to conceal narcotic proceeds. I am also familiar with and have utilized a wide variety of investigative techniques, including but not limited to, the development of cooperating sources, source debriefings, physical surveillance, telephone toll analysis and electronic surveillance. I have been involved in several State and Federal investigations that utilized electronic surveillance.

2.    I have completed TFO training through the DEA and have training and experience in conducting investigations into violations of the Controlled Substance Act (21 U.S.C. § 801 *et seq*.). I have participated in the execution of state and federal search warrants resulting in the recovery of controlled substances and other illegal contraband. I have participated in the execution of search warrants on cell phones. The execution of those warrants resulted in the recovery of information identifying the user of the phone, contact information for known and unknown associates of the possessor, text message correspondence, and photographs and videos. The recovery of this information has furthered investigative efforts by providing additional information and evidence regarding crimes including narcotics trafficking and illegal firearms possession.

3.    I make this statement in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the following property:

    a.  Black Apple iPhone X smartphone, serial number unknown ("**Subject Telephone 1**"), as further described in Attachment A;

    b.  Black LG cellular telephone, serial number 804VTCL135259 ("**Subject Telephone 2**"), as further described in Attachment A;

    c.  Black ZTE smartphone, serial number 32FB7686199D ("**Subject Telephone 3**" and collectively, with **Subject Telephone 1** and **Subject Telephone 2**, the "**Subject Telephones**"), as further described in Attachment A.

As described in more detail below, the **Subject Telephones** were seized from Donnell Booker ("Booker"). The **Subject Telephones** are currently in law enforcement's possession at the DEA, Nashville District Office, located at 801 Broadway, Nashville, Tennessee 37203.

4.    Based upon my training and experience and the facts set forth in this statement, there is probable cause to believe that criminal violations of, among other statutes, Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm), 1956 and 1957 (Money Laundering), and Title 21, United States Code, Sections 841 and 846 (Drug Trafficking and Conspiracy) (collectively, the "**Subject Offenses**") have been, and are continuing to be, committed

by individuals, known and unknown, including, but not limited to, Booker. Accordingly, there is probable cause to believe the **Subject Telephones**, as more particularly described in Attachment A, were used in furtherance of, or may contain evidence related to, the **Subject Offenses,** as more particularly described in Attachment B.

5.      The facts in this statement come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This statement is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. Except where indicated, all statements referenced herein are set forth in substance and in part, rather than verbatim.

## PROBABLE CAUSE

6.      In April 2018, the DEA Nashville District Office began receiving information about the drug trafficking activities of Hector Lopez, Jr. ("Lopez, Jr.") from multiple law enforcement agencies in Kentucky, including the DEA Louisville Field Office. The DEA was advised that, based on information received during an ongoing investigation, Lopez, Jr., his brother, Armando Lopez, and others yet identified were distributing large amounts of marijuana and methamphetamine in the Middle District of Tennessee. The DEA was provided with addresses of possible stash house locations in Wilson County, Tennessee.

### Identification of the Vehicle Utilized by Hector Lopez, Jr.

7.      During continued surveillance of residences frequented by Lopez, Jr., law enforcement officers observed a gray Honda Accord, bearing Tennessee tag BKH492. According to the registration database, Tennessee tag BKH492 is registered to Lopez, Jr. with the listed address of 1518 Stonehill Road, Mount Juliet, Tennessee.

3

8.     During this investigation, law enforcement officers identified 537 Sandy Drive, Mount Juliet, Tennessee, as a residence utilized by Lopez, Jr. in furtherance of his drug trafficking. Law enforcement officers observed the gray Honda Accord at this residence on several occasions during daytime and early morning hours.

9.     On August 14, 2018, at approximately 10:45 a.m., law enforcement officers with the Mount Juliet Police Department CID Unit ("MJPD CID") began surveillance on 537 Sandy Drive. Law enforcement officers observed the gray Honda Accord parked in the driveway of the residence. At approximately 1:20 p.m., law enforcement officers witnessed the gray Honda Accord depart 537 Sandy Drive and identified the driver as Lopez, Jr.

10.     On August 17, 2018, a State of Tennessee Order Authorizing the Installation and Monitoring of a GPS Tracking Device on the gray Honda Accord was applied for and granted. On August 18, 2018, at approximately 4:45 a.m., law enforcement officers observed the Honda Accord parked in the driveway of 537 Sandy Drive. The tracker was placed on the vehicle without incident and law enforcement officers departed the area.

### The Arrest of Jennifer Jean Tucker

11.     On August 22, 2018, DEA Nashville agents, Metro Nashville Police Department ("MNPD"), Major Crimes Task Force Detectives, and MJPD CID Detectives initiated surveillance of Lopez, Jr. At approximately 12:15 p.m., law enforcement officers observed Lopez, Jr. in the gray Honda Accord on Mount Juliet Road. Law enforcement officers followed Lopez, Jr. to a residence located at 5389 Beckwith Road, Mount Juliet, Tennessee. While conducting surveillance at that location, law enforcement officers observed a red, Ford Edge SUV, with the rear hatch open, pull to the rear of the house. Law enforcement officers observed Lopez, Jr. meet

4

with a white female near the red, Ford Edge SUV and then saw the white female drive the SUV out of 5389 Beckwith Road toward interstate 40.

12.    Law enforcement officers observed the red, Ford Edge SUV on previous surveillances.  It had a Tennessee tag 2G89E5.  The SUV was an Avis Rental car, and information from Avis showed that the vehicle was rented on August 11, 2018 in Memphis, Tennessee to an Alta Alaniz ("Alaniz") with a Texas Driver's License.  Law enforcement databases, listed Alaniz as a suspected methamphetamine transporter from Houston, Texas and as an associate of the Lopez drug trafficking organization.

13.    Law enforcement officers followed the red, Ford Edge SUV as it took Briley Parkway and then I-24 towards Clarksville.  While traveling on I-24, MNPD K-9 Officer Joe Simonik initiated a traffic stop on the SUV for a traffic violation. Officer Simonik made contact with the driver, who was identified as Jennifer Jean Tucker ("Tucker"). During the traffic stop, Officer Simonik deployed his drug detection K-9 "Boston," which resulted in a positive alert for the presence of narcotics in the vehicle.  Tucker stated that the car was not hers and did not know if anything was inside. Officer Simonik searched the vehicle and discovered two, brick-size packages consistent with kilogram quantities of narcotics.   Officer Simonik field tested the substance contained in one of the brick packages and received a positive test result for heroin.  The packages of heroin were later weighed at the DEA Nashville Office with a combined weight of 2.25 kilograms.

14.    Law enforcement officers placed Tucker in custody and advised her of her *Miranda* rights.  Tucker stated that she understood her *Miranda* rights and said that she would cooperate with law enforcement officers and answer their questions.  During the ensuing interview, Tucker stated the following:

5

a.     Armando Lopez, an individual who is currently in prison, directs Tucker to deliver narcotics;

b.     Tucker conducts money remitter transactions for Armando Lopez and Lopez, Jr., regularly wiring money to people in California;

c.     Armando Lopez has people store narcotics in a trailer at Tucker's residence located at 5389 Beckwith Road, Mount Juliet, Tennessee;

d.     Armando Lopez directed Tucker, via an encrypted phone application, to get the two packages found in the car she was driving from the trailer behind her residence and deliver them to a customer in Clarksville, Tennessee;

e.     Tucker met Armando Lopez's brother, Lopez, Jr., at Tucker's residence on August 22, 2018 and told Lopez, Jr. that Armando Lopez had told her to get two packages;

f.     Lopez, Jr. went into the trailer, retrieved the two packages and gave them to Tucker, who put them in the red, Ford Edge SUV;

g.     Tucker knew the packages contained heroin;[1]

h.     Lopez, Jr. was still at Tucker's residence when Tucker departed.

15.     While speaking with law enforcement officers, Tucker provided a description of the customer in Clarksville, Tennessee. The information was passed along to Clarksville Police Department ("CPD") Investigators, who suspected the recipient to be Booker. CPD Investigators sent a photo line-up of Booker and five other individuals, and Tucker identified Booker as the intended recipient of the heroin. Additionally, Tucker admitted to making between six and eight narcotics deliveries to Booker in the past and recently delivered crystal methamphetamine to him.

---

[1] Tucker initially stated that she knew the packages contained drugs but did not know the drugs were heroin. Tucker later admitted that she knew the packages contained heroin because Lopez, Jr. told her that was what was in the packages when he retrieved them for her.

6

16.     During the interview with law enforcement officers, Tucker gave consent to search her phone and identified Lopez, Jr.'s number.   Tucker showed agents pertinent text messages between her and Lopez, Jr., including texts where Lopez, Jr. was advising her to wire money. Tucker consented to a search of 5389 Beckwith Road, and law enforcement officers transported Tucker there. During the search, law enforcement officers located and seized three pounds of marijuana from Tucker's bedroom.   In the trailer where Tucker stated that the narcotics were stored, law enforcement officers located packaging consistent with the package used with the two kilograms of heroin found in the red, Ford Edge SUV.

### The Arrest of Hector Lopez, Jr.

17.     After Lopez, Jr. departed the 5389 Beckwith Road residence, law enforcement officers followed him as he went directly to 537 Sandy Drive, Mount Juliet, Tennessee.  After the consent search at 5389 Beckwith Road was completed, law enforcement officers took Lopez, Jr. into custody as he was attempting to leave the Sandy Drive address.

18.     Law enforcement officers read Lopez, Jr. his *Miranda* rights verbatim. Lopez, Jr. stated that he understood his rights and agreed to speak with law enforcement officers at that time. After questioning, Lopez, Jr. stated the following:

    a.     Lopez, Jr. sold marijuana and coordinated narcotics transactions for Armando Lopez;

    b.     Lopez, Jr. was at 5389 Beckwith Road earlier that day with Tucker;

    c.     Lopez, Jr. went into the trailer at 5389 Beckwith Road, retrieved two kilograms of heroin, and gave the two kilograms of heroin to Tucker to take to a customer in Clarksville, Tennessee;

7

d. Tucker has made multiple trips to Clarksville, Tennessee to deliver methamphetamine and heroin on behalf of Armando Lopez;

e. Lopez, Jr. arranged for money and wire transfers to be sent to the marijuana and methamphetamine source of supply in California;

f. Brian Robles, Lopez, Jr.'s cousin, received the money in California and arranged for the shipment of narcotics to various addresses in Tennessee;

g. when the packages arrived, Tucker would pick them up, and the narcotics were stored in the trailer at 5389 Beckwith Road.

19.     At the time of Lopez, Jr.'s arrest, law enforcement officers also detained Anna Herrera ("Herrera"), Lopez, Jr.'s fiancé. Herrera is a suspected co-conspirator of Lopez, Jr. During this investigation, Herrera's name was discovered on money wire transfers to the suspected source of supply in California as well as on documents related to suspected stash houses, including utilities for these residences, utilized by the drug trafficking organization.

20.     After Lopez, Jr. and Herrera were detained, a State of Tennessee search warrant for the residence of 537 Sandy Drive was issued. The search resulted in the discovery of approximately $8,000 cash and several ounces of marijuana.

21.     On August 23, 2018, Tucker and Lopez, Jr. were charged by criminal complaint with conspiring to possess with intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin. On September 19, 2018, a grand jury sitting in the Middle District of Tennessee returned an indictment charging Lopez, Jr. and Tucker with conspiring to possess with intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, and 500 grams or

8



more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance.

### Arrest of Donnell Booker and the Seizure of 15 Pounds of Methamphetamine

22.    On August 23, 2018, after Tucker identified Booker as the intended recipient of the heroin, CPD Investigator Will Evans obtained two State of Tennessee search warrants for the residences of Booker and his wife, Vanessa Booker, located at 777 Banister Drive, Clarksville, Tennessee, and 3453 Merganser Drive, Clarksville, Tennessee. Booker and his wife were in the process of moving from 3453 Merganser Drive to 777 Banister Drive, and were in possession of both properties.

23.    On August 24, 2018, at approximately 7:00 a.m., the CPD executed the search warrants. Booker was present inside of the residence located at 777 Banister Drive and taken into custody. At the time of his arrest, Booker was in possession of **Subject Telephone 1**. A search of 777 Banister Drive resulted in the discovery and seizure of, among other things, the following items:

   a. **Subject Telephones 2** and **3** on the nightstand of the master bedroom;

   b. a ledger on the nightstand of the master bedroom that contained various names and phone numbers, including the name Armando Lopez with telephone number (615) 606-6776 and the number 369298, later determined to be Armando Lopez's identification number within the Tennessee Department of Corrections;

   c. a hydraulic press with bottle jack on the floor of the master bedroom;

   d. a set of keys next to Booker's wallet in the master bedroom;

   e. $48,040 of United States currency concealed in the air vents and $2,791 of United States currency located in other locations in the residence;

9

f.   an invoice from U-Haul Moving and Storage in bedroom 2;

g.   a bag of suspected marijuana in bedroom 5;

h.   a silver digital scale, a vacuum sealer, and a mask and rubber gloves in in the kitchen;

i.   a money counter in the living room;

j.   a digital scale in a backpack located in a closet; and

k.   three baggies containing blue pills in the toilet of bathroom 2.

24.     Just prior to the execution of the search warrant at 3453 Merganser Drive, Clarksville, Tennessee, CPD Investigators observed Vanessa Booker attempt to depart the residence in a Black Dodge Ram bearing Tennessee tag 84TF80. CPD Investigators conducted a traffic stop of the vehicle, and detained Vanessa Booker. A pipe, a U-Haul Self-Storage security scan card, and a set of keys were seized from the vehicle. A search of 3453 Merganser Drive resulted in the discovery and seizure of, among other things, the following items:

a.   a metal grinder;

b.   plastic baggies;

c.   a plastic baggie containing an unidentified white powder;

d.   a badge from the Tennessee Department of Corrections;

e.   two security badges from Riverbend Maximum Security Institution operated by the Tennessee Department of Corrections;

f.   a Community Corrections pin; and

g.   six sets of keys.

25.     On August 24, 2018, DEA TFOs Matthew Moore and Brandon McCauley met with CPD Investigators. CPD Investigators transferred custody of the $48,040, the hydraulic press with



bottle jack, the **Subject Telephones**, and the three baggies of blue pills. These items were processed per the policies and procedures of the DEA Nashville District Office.

26.  · Following the execution of these two search warrants, CPD Investigators contacted U-Haul Moving & Storage located at 2830 Wilma Rudolph Boulevard, Clarksville, Tennessee, and determined that that unit 093 was assigned to Vanessa Booker. CPD Investigators then applied for, and obtained a State of Tennessee search warrant for storage unit 093.

27.  On August 24, 2018, at approximately 5:00 pm, CPD Investigators executed the search warrant at the U-Haul Moving and Storage, unit 093, located at 2830 Wilma Rudolph Boulevard, Clarksville, Tennessee. During the search, investigators discovered a FedEx parcel addressed to Mary Nelson, 704 Eugenia Ct., Mount Juliet, Tennessee. The parcel contained six sealed manila envelopes and one opened envelope. The open envelope contained a vacuum sealed bag, in which were two saran-wrapped packages containing suspected crystal methamphetamine. The remaining six manila envelopes also contained suspected crystal methamphetamine packaged in the same manner. Total gross weight for the suspected crystal methamphetamine was 6,823 grams, approximately 15 pounds. A sentry safe was also discovered in the storage unit; the safe was opened with a key from the set recovered next to Booker's wallet in the master bedroom of 777 Banister Drive. The safe contained an unloaded Rossi .38 caliber revolver (S/N DT45615) and a box of 10, .38 caliber bullets.[2] The safe also contained a digital scale, a box of Glad sandwich baggies, electrical tape, and a baggie containing tobacco.

28.  The suspected crystal methamphetamine was transported to the Montgomery County Drug Task Force, where it was tested utilizing the TruNarc Scanner. The TruNarc scanner

---

[2] Law enforcement officers knew at the time they executed the search warrant that Booker was a convicted felon.

identified the substance contained in each of the seven, vacuum-sealed bags as methamphetamine. The DEA took possession of the methamphetamine and it was sent to the DEA laboratory for testing. The firearm is in possession of the CPD.

29.　　After executing the search warrant at the U-Haul Moving and Storage, CPD Investigators observed video surveillance of the storage unit from August 22, 2018. The surveillance video showed Booker, riding as a passenger in a vehicle, accessing the storage unit facility and entering the area where the unit was located after exiting the car. CPD Investigators also observed a female matching the description of Vanessa Booker as the driver of the vehicle, but Vanessa Booker did not exit the vehicle during any of the surveillance videos.

### Interviews of Donnell Booker and Vanessa Booker

30.　　On August 24, 2018, TFO Moore and TFO McCauley conducted separate interviews of Booker and Vanessa Booker. In relevant part, Vanessa Booker stated the following:

　　　　a.　　Booker is her husband and they have been married for a little over a year;

　　　　b.　　she was not aware of any money hidden in the HVAC air return and none of the United States currency found during the searches was hers;

　　　　c.　　she was not aware of any of the blue pills that were found in 777 Banister Drive;

　　　　d.　　she had seen the kilo press in the house but was unaware of what it was for;

　　　　e.　　she was not aware of Booker's involvement in any drug activity;

　　　　f.　　Booker knew about the storage unit but had no access to it;[3]

　　　　g.　　she used the storage unit to store TVs that she purchases from a liquidator for resale;

---

[3] Vanessa Booker initially stated that Booker had no knowledge of the storage unit.

12



> h.     the last time she was at the storage unit was a few days ago;
>
> i.     on August 22, 2018, she was sick and stayed in bed; and
>
> j.     she did not remember what Booker was doing on that day.

31.     During his interview, Booker stated the following:

> a.     he was not aware of any money hidden in the HVAC air return;
>
> b.     the money found in the house was not his;
>
> c.     the kilo press found in his residence was a car jack;
>
> d.     he was not going to meet anybody on August 22, 2018 to receive heroin and was going to a doctor's appointment with his wife on that day;
>
> e.     he did not mess with heroin or fentanyl;
>
> f.     he knew Armando Lopez from when they were in prison together in Hardeman County;[4] and
>
> g.     he did not know Lopez, Jr. or Tucker.

32.     Booker was arrested and charged in Montgomery County with felony possession of methamphetamine, tampering with evidence, and felon in possession of a firearm.

## TRAINING AND EXPERIENCE REGARDING THE USE OF CELLULAR TELEPHONES

33.     Based upon my training and experience, I know that persons who are involved in the **Subject Offenses**, and in offenses involving controlled substances, in particular, commonly use their cellular telephones to do the following:

---

[4] Booker initially stated he did not know who Armando Lopez was, but Booker admitted he knew Armando Lopez when law enforcement officers told Booker that they had recovered a ledger with Armando Lopez's name on it in Booker's residence.

13



a. Maintain records and other data from various forms of communication related to their sale and distribution of controlled substances and the laundering of proceeds from those sales;

b. Discuss and negotiate their sales of controlled substances via telephone calls, iMessaging services, and text messages;

c. Maintain addresses and telephone numbers of their co-conspirators, customers, and suppliers in the electronic address books within their cellular telephones;

d. Generate, transfer, count, record and/or store records, invoices, receipts, bank statements, and other related records;

e. Store photographs and videos of themselves, their co-conspirators, and their property, including firearms, violent activities, illicit controlled substances, and proceeds from the sale of those controlled substances; and

f. Store information related to social media networks, such as Instagram and Twitter, which may contain additional information, photographs, and videos of themselves, their co-conspirators, and their property, including firearms, violent activities, illicit controlled substances, and proceeds from the sale of those controlled substances.

34. Additionally, based upon my training and experience, I know that persons who are involved in the **Subject Offenses**, and in offenses involving controlled substances, in particular, often carry multiple cellular telephones at once. They often use different phones to speak with their respective suppliers/customers/co-conspirators in order to make it more difficult for law enforcement to intercept their calls and text messages. They also often will use a rotation of different cellular telephones for that same reason.

14

35.     Finally, in my training and experience, examining data stored on cellular phones can uncover, among other things, evidence that reveals or suggests who possessed or used the device and where they travelled with the telephone.

## TECHNICAL TERMS

36.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard

15

drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

       c.     Portable media player: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

       d.     GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

       e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access

the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

37.     Based on my training, experience, and research, I believe that the **Subject Telephones** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

38.     The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

39.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

40.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the cellular

telephone was used, the purpose of its use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Telephones** because:

    a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file);

    b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence;

    c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when;

    d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant; and

    e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    41.    *Nature of examination.* Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Telephones** consistent with the warrant. The examination may require authorities

18

telephone was used, the purpose of its use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Telephones** because:

    a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file);

    b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence;

    c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when;

    d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant; and

    e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    41.    *Nature of examination.* Based on the foregoing, and consistent with Federal Rule of Criminal Procedure 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Telephones** consistent with the warrant. The examination may require authorities

18

Case 3:18-mj-01249   Document 1-1   Filed 12/04/18   Page 19 of 23 PageID #: 24

to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

42.     *Manner of execution.*   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43.     I submit that this affidavit supports probable cause to believe that the **Subject Telephones** contain evidence or served as instrumentalities of the **Subject Offenses**. Accordingly, I respectfully request that this Court issue a warrant to search the **Subject Telephones**, as more particularly described in Attachment A, to seize the items described in Attachment B.

19

## ATTACHMENT A

The property to be searched is the following:

1.      A Black Apple iPhone X smartphone, serial number unknown ("**Subject Telephone 1**") currently stored at the Drug Enforcement Administration, Nashville District Office, 801 Broadway, Nashville, Tennessee;

2.      A Black LG cellular telephone, serial number 804VTCL135259 ("**Subject Telephone 2**") currently stored at the Drug Enforcement Administration, Nashville District Office, 801 Broadway, Nashville, Tennessee; and

3.      A Black ZTE smartphone, serial number 32FB7686199D ("**Subject Telephone 3**") currently stored at the Drug Enforcement Administration, Nashville District Office, 801 Broadway, Nashville, Tennessee.

## ATTACHMENT B

## ITEMS TO BE SEIZED

1.     The search of the property described in Attachment A shall include all records and information that may constitute evidence of criminal violations relating to Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm), 1956 and 1957 (Money Laundering), and Title 21, United States Code, Sections 841 and 846 (Drug Trafficking and Conspiracy), including:

        a.     Any and all records and information relating to the telephone numbers and direct connect numbers or identities assigned to the device;

        b.     Any and all records and information relating to the address book on the device, including, but not limited to, contact names, phones numbers, addresses, email information, and social media identifiers;

        c.     Any and all records and information relating to call logs, incoming and outgoing calls, missed calls, and direct connect history information;

        d.     All voice mail content;

        e.     All text messages, iMessages, and multimedia message, whether sent, received, or in draft form;

        f.     Any and all records and information relating to stored photographs and videos;

        g.     Any and all records and information relating to GPS location history;

        h.     Any and all records and information relating to internet search history;

        i.     Any and all records and information relating to types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;



j.      Any and all records and information related to the sources and customers of drugs, including names, addresses, phone numbers, or any other identifying information;

k.      Any and all records and information relating to the user's schedule or travel, including, but not limited to, airline, rental car, and/or hotel reservations, confirmation documentation, receipts, and payment information;

l.      Any and all bank records, checks, credit card bills, account information, and other financial records;

m.      Any and all records, information, photographs, or videos relating to the possession or use of firearms;

n.      Any and all records, information, photographs, or videos relating to narcotics trafficking or proceeds from narcotics trafficking or other illegal criminal activities; and

o.      Evidence of user attribution showing who used or owned the cellular telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

2.      As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

